All rise. The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and His Honorable Court. Thank you. Mr. Obey, before you start, the first case is No. 9, 1338, Passe & Seymour v. ITC. I want to tell you why your hearing was stopped very promptly and we were a few minutes delayed. Because we were discussing the issue, which isn't completely clear in our minds, although it must be in yours, as to how these various issues and patents are interrelated and whether, if in fact we affirm or reverse on a particular issue, how that will affect the other patents as far as the issues now brought before us on appeal. Would it be too disruptive if we asked each of you, before we got into the regular issues on appeal, to give us your quick rundown as to how all of these patents and appeals are interrelated, that is, if we were to reverse or affirm in one area, whether other issues are therefore automatically resolved? Is that too complex? If it's too complex, and we might, rather than pin you down to an immediate binding position, perhaps to ask your present view and then perhaps supplemental briefing to make it clear as to where we stand would be helpful. But is there something, Mr. Obey, that you could, in just a minute or so, just summarize? I know in your brief you said that if you do this, then you don't have to reach this patent, but if you do something else, then it has a longer life and so on. So there are two appeals arising from the same ITC. Yes, but we view them as interrelated. As I understand it, there are four patents we're talking about here. There's the 398 and the 386, the 340 and the 564. And if I understand correctly, those latter three patents all expire in May of 2021, and the 398 patent expires in October 2014. Am I correct about that? I haven't looked at the dates, but that sounds about right. The three latter patents all form the same family, and I know that the 386 has a slightly longer life, and that's why we said under the Yingbin case, if you were to reverse on 386 in our appeal, the first appeal, you don't have to reach anything else. Okay, I think the basic question that we're struggling with is if we have two patents with the same expiration date, and does it make any difference from the ITC relief as to whether one patent is infringed or two patents are infringed? I would answer that specifically in this case, with respect to the 386 and the 340. There are only two patents in this particular appeal, cross appeal, is that right? In the first appeal, there's two patents that issue in our appeal, the 398 and the 386. In the other appeal, there's the 340, the 398, and the 564. So there's four patents total in between the two appeals. The 398 comes up in both cases. So suppose we were to say that a product infringes one patent. Do we then have to go on and decide whether it infringes another patent as well? You have to consider the 386, because it has a longer life, and because there are more products involved. There's one additional product that does not infringe the 340 that infringes the 386, so you have to consider the 386. Right, but if we have a single expiration date and the same product involved, does it make any difference whether that product infringes one patent or two patents? It does from our standpoint, because the 564 is sort of a narrower invention. So it does from our standpoint that the 340 is considered independently. The 564 is only asserted against one product. The 340 is asserted against many. So the order of analysis really is the 386, then the 340. Yeah, but I think maybe I didn't make my question clear. If we're dealing with two patents with an identical expiration date, okay, and we're dealing with a single product, does it make any difference whether the product infringes one patent or two patents? It does from our standpoint. Why is that? Because the 340 is a broader patent, provides broader protection, so the injunction is broader. The 564 is a narrower invention. It's an indicator light. So between those two, it is significant. Let's inquire of the Commission as to their—we're not running the clock. We'll start again—as to what you might have to say on this point. I'll answer your honest question. As I read the Yingbin case, the Yingbin case says that it effectively renders an appeal moot if the same product is excluded under a different patent. I tend to agree that, at least substantively, having an injunction as to two patents with different scopes of claims is, in its nature, broader than just the one, even if it does exclude the same product. But I think Your Honor's question is, at least answered, or Yingbin comes very close to answering that question. Is that case discussed in the brief? I think that passing Seymour's open agreement in the first appeal this morning does a decent job of setting out—and this is in the standard of review and need for review section on page 14 of their open agreement—does a decent job of setting out some of— I mean, to set out all of the interplay would be very difficult because of the interplaying of the issues and the different issues presented with respect to different patents and products. But it at least does—and I think the last paragraph kind of explains broadly how they fit together, and that is that affirming as to the 340 patent or reversing the Commission's negative determination with respect to the 386 patent would render—and I hope I'm reading this correctly—passing Seymour's appeal as a 398 moot. Under Yingbin. But if the Court disagrees with the read that's presented here of Yingbin and agrees that an injunction as to two patents is broader, even if it only covers the same product, then I think that all of the patents would need to be considered to become the scope of the injunction. And what's the Commission's position about that, whether it makes a difference whether it's one or two patents, if they have the same expiration date and the same product? Well, obviously, the Commission wants to follow the Court's precedent. But, you know, the Commission does tend to agree that reading Yingbin does tend to support the opposite view. Does that answer your question? Yes, thank you. Okay. Yes, we will proceed. If we still have questions after the argument, we'll perhaps invite you to elaborate on all of this. All right, let's start again with Cases No. 09, 13, 38, passed in Seymour against the International Trade Commission. The first of these two appeals, Mr. Obeyte. Thank you, Your Honor. As I mentioned, this is the first of two appeals from the same proceeding. The trial lasted 10 days. In this case, there was testimony from over 40 witnesses admitted in over 2,000 exhibits, and ALJ voted a 172-page opinion that was then reviewed by the Commission under its appellate process. And, Your Honor, notwithstanding the seating at the Council tables this morning, we largely agree with the Commission's decision. We have three discrete issues we raise in our appeal, and that is the construction of the circuit introductory limitation of the 386 patent and the construction of the mounting means and unitary electrically conducting member in the 398 patent. With respect to the circuit introductory limitation on 386, that limitation requires that the device, the GFCI, trip in response to an actuator signal in the reset state. And what the Commission did was they read the words, in the reset state, out of the claim. This is contrary to ordinary rules of claim construction. We can't read into the claim or out of the claim. It's also contrary to the majority of the embodiments in the specification. Well, the curious thing to me is that's what it seems to me your construction does, which is read something out of the claims. So now you can tell me what I'm wrong. What I think your construction reads out of the claims is the wiring state detection signal. And I can go into why, but I think you may already realize what my concern is. Sure, and I can answer that. So the claim has a fault detection signal and a wiring state detection signal that feed into an actuator assembly. The actuator assembly gives us an actuator signal, which goes to the circuit introductor. And then it says the circuit introductor will trip the circuit if the device is in the reset state. Now what the commission said is these two signals feed in, they give you an actuator signal, and that trips the circuit. The actuator signal, you agree, includes both signals. The actuator signal is responsive to both signals. It can respond to both the fault detection signal and the wiring state detection signal by providing an actuator signal. It's not one signal. In fact, the specification shows that two different signals can be the actuator signal. There's one type of actuator signal that figures one through three embodiment. Well, your basic position, as I understand it, is that either one, either a tripping because of a fault or a tripping because of the wiring signal is sufficient. Do I understand that correctly? Well, I would just say not a tripping, Your Honor. That's sort of the technical term here. It's a signal that responds to a fault or a wiring state, correct. But it doesn't have to do both. It just has to do one or the other. Well, no, no. The devices do both. The devices do both. The question is what happens when you get the actuator signal. But we agree that both inputs will give you the actuator signal. But what happens when you get the actuator signal? Well, that can be provided to the circuit interrupter. And the circuit interrupter will trip if the device is in the reset state. If the device is not in the reset state, the circuit interrupter does nothing. But the actuation signal may perform some other actuation. And the claim uses the transitional comprising, meaning that the claim is open to other actuation. And this is the Figure 4 through 11 embodiment. In the Figure 4 through 11 embodiment, in response to the actuator signal, the device doesn't trip. It moves a barrier, removes some impediment to resetting of the device. It could be a physical impediment like a blockage or it could be… But the claim seems to refer to a trip. Where is that, Your Honor? In the last claim limitation, configured to disconnect the first conductive path from the second conductive path. Yes, it trips in response to the actuator signal. The device will trip if the device is in the reset state. If it's not in the reset state, it needn't trip. It need only then provide an actuator signal, which can perform some other actuation in the device. How do we know that from reading the language? The language includes both the response to the fault detection signal or the wiring state detection signal. There's no exclusion in the language. The response is it provides an actuator signal. And the actuator signal then goes to the circuit interrupter. And then the question is, what does the circuit interrupter do with it? If the device is in the reset state, the circuit interrupter will trip. That's what it says. If the device is not in the reset state, the circuit interrupter does nothing with the signal. The signal can be used for other actuation in the device. And that's exactly what happens in Figures 4 through 11. And we know that those figures are encompassed in Claim 1, because Claims 2 and 5 actually claim… Dependent Claims 2 and 5 actually claim the Figure 4 through 11 embodiment. So we know that Claim 1 encompasses that. You know… Why do we know Claim 1 embodies that? Because Claims 2 and 5… Yeah. Claim… If you look at Claim 5, they talk about a lockout mechanism. And if you look at Claim 2, they talk about a reset button that closes… I'm sorry. When you push the reset button, you close a switch. That is part of the embodiment of Figures 4 through 11. Both of those limitations are the Figure 4 through 11 embodiment. And the Figure 4 through 11 embodiment does not trip the device in response to the actuator signal. It performs some other actuation. It moves a barrier to allow the device to be reset. And the claim uses its replacement transitional to allow that. There's no dispute as to the accused products. They perform exactly like the Figure 4 through 11 embodiment. If you get a wireless fake detection… But that doesn't mean that this claim covers that, right? Well, I suggest to you it does in view of Claims 2 and 5. The dependent claims show that the independent claim is broad enough to cover… Yeah, but there are, you know… How many claims in this patent? Thirty-nine. Yes. Yes, there are… Claims 2 and 5, depending from Claim 1, show that Claim 1 is broad enough to cover that. Now… But that doesn't mean that every embodiment shown in the specification necessarily comes within a particular claim. That's why you have different claims. How do we know that those embodiments are within this particular claim as opposed to some later claim in the patent? What I'm saying is that Claim 2, which depends from Claim 1, refers to the Figure 4 through 11 embodiment, and Claim 5 as well. And therefore, Claim 1 must be broad enough to cover that. Well, how do we know that those dependent claims refer to those embodiments? Okay, that's a fair question. If you look at Claim 2, this is Column 15 of the patent, Line 4 and 5, the reset button being configured to close the switch and thereby generate the wiring state detection signal. And let's look at Figure 8 of the patent, Your Honor. The switch we're talking about is the switch that's towards the bottom of the figure, and it's labeled S1. And you'll see that in Figure 8, it's open. The two contacts are open. Where that S1 points to, there's an opening. And if you look at Figure 9, the two contacts are closed. That's when the reset button is being pushed. Yeah, but where does it say that these embodiments and these figures relate to these claims? I mean, that just seems to be your argument. But where does it demonstrate that? It's that claim language, Your Honor, that says the reset button, when you push the reset button, you're closing the switch. That creates the wiring state detection signal. There's no such button in the Figure 1 through 3 embodiments. It's only in the Figure 4 through 11 embodiments. I guess I understand what you're saying. Okay. Well, I could also point to Figure 5. It refers to a lockout mechanism. And the only lockout mechanism referred to is the lockout mechanism in the Figures 4 through 11 embodiments. So, again, that's showing that Claim 1 is broad enough to cover both embodiments, the embodiment of Figure 1 through 3 and the embodiment of Figures 4 through 11. Just a comment, and this is not directed to you in particular, but to everybody in this case. I found these briefs very difficult to follow. I'm sorry? I found the briefs very difficult to follow. I spent a lot of time with them. They are hard to understand. Okay? Well, I'm sorry, Your Honor. You know, that goes to a really good point. This is a fairly complex case. There were actually six patents at the trial. As I said, there were 40 witnesses and 2,000 exhibits. And we think the ALJ got it right. He looked at the witnesses and made credibility determinations on lots of issues. And we think that he largely got it right. The ALJ got it right, and the Commission largely got it right. If we agree with the claim construction that the Commission ultimately rested on, do you agree that none of the products of respondent infringe? In the three of these six patents? Yes, Your Honor. Okay. You know, I guess I could spend a moment. To summarize the circuit interrupter, the claim language only requires what the circuit interrupter does in the reset state. It doesn't say what it does in the trip state. And the claim is open to other actuation in the trip state. The actuator signal can do something else, and that's what these other embodiments show. On the unitary member limitation, the Commission construed that limitation as requiring a member originally formed of one piece as opposed to a member comprised of components that are assembled and permanently attached during. What does unitary mean? Unitary refers to, this is apparent from the prosecution history. We were distinguishing the art, and we were talking about in the art, these devices have a hot and neutral side, so they correspond to the plug. You plug into the front, the current goes from hot to neutral. In the prior art, it showed a conducting member on one side of the device having a single contact, a conducting member on the other side of the device having a single contact. And we distinguished that by specifically saying that the prior art had separate arms, each having a single contact, separate sides of the device. What we have is a unitary member with two contacts. And unitary was referring to one side of the device. The claim one is directed to one side, the hot side, or the neutral side, not both. And that's undisputed. And that was the distinction. That seems kind of improbable actually. I'm sorry? That sounds like an improbable construction of unitary. It's not. Why is that the construction of unitary? What the commission read into unitary was the idea that these parts had to be made in one piece as part of the manufacturing operation as opposed to a few pieces that are attached together, permanently attached in the final product. And that's shown in Figure 34 of the patent. We have a member with three parts that are permanently attached by limits. And we suggest that that's what unitary means. The way we distinguish unitary from the art, and unitary, you know, the point of it, I read the plain language definition of unitary can include units. But you're arguing here, if I understand correctly, on the 398 patent that separate wires are unitary, right? I'm sorry? You're arguing that separate wires are unitary. No, we're arguing that in the final product, they're permanently attached. The wires are permanently attached. Correct. They're welded together. Even though they're separate. Well, they're not separate. They're welded together in the final product. At some point in the manufacturing process, there were two metal plates and a copper cable. But as part of the manufacturing process, they weld those together. And in the product, they're welded together. They're permanently attached. That makes it a unitary member with two contacts. And the way we distinguish the art was to say, no, it's not two sides of the device. It's one side of the device where you need the two contacts. And that's the distinction that we drew. You know, the ALJ made a specific finding that the art showed this idea of one member on either side, each having a single contact. And that was the distinction in the art. On the mounting means limitation, I'll just spend very briefly that the mounting means limitation refers to moving to a second position where the contacts are in space, circuit breaking relation. This is the tripped position of the device. The device has two states, the reset state when the contacts are closed and the tripped state when they're open. That element is referring to the tripped state of the device when the contacts are open. These devices, the accused devices, both contacts move. We show that in our reply brief. They move to an open position, a tripped state, and that's all the claim is requiring. That's consistent with one of the other embodiments of the unitary member, the leaf spring formed intimately with the bus bar. Your Honor, if there are no further questions, I know that you'd like to ask. We'll save your rebuttal time, Mr. DeGate. Thank you. Okay. Mr. Burtowski, the procedure has been explained that your red light will go on at the various time frames that you all have selected. Okay. Good morning, Your Honor. Please report. Passing Seymour is a fundamental error in this. I would suggest that the briefing is confusing on this and it's confusing for a reason. They need to confuse this issue in order to win. Because reading this back... That's not fair. Your Honor, let me explain why I say that. They make a fundamental error in their analysis of the limitation issue, the configured-to-disconnect limitation. And their fundamental error is that they want to focus on the state of the device, the tripped state, that's not an issue with respect to that limitation, which explicitly describes how the device is configured to respond to that actuator signal in the reset state. And they confuse other embodiments, which indeed discuss the tripped state, with excluding... You know, they argue that the commission's analysis, which properly focuses on the description of embodiments in the patent that describe the reset state, as excluding other embodiments and things that might or might not happen in the tripped state of the device. If you focus on... The figures that they mention in their argument does relate to the tripped state? The figures, yes, indeed. Figures 4 to 11 describe a reset lockout device, which prevents going from the tripped state to the reset state, absent a detection of proper wire. So they're not figures that show what happens in the reset state. Exactly, Your Honor. Figures 1 to 3 do. So, when they describe the figure, let's take claim 2, they made an argument that claim 1 is broad enough to cover things that might or might not happen in the tripped state because of claim 2, which includes a reset button. To some extent, they're correct. It's broad enough to cover that, but that does not mean that the configured-to-disconnect limitation has anything to do with what happens in the tripped state. It has a specific requirement that that circuit interrupter be configured to trip in response to the actuator signal if it's received in the tripped... I'm sorry, in the reset state. Regarding the reset button, it's another thing. Naturally, you press the reset button most times in the tripped state. You push it to go from tripped to reset. Notably, however, figure 1, and we point this out at page 42 of our brief, figure 1 is explicitly described as accommodating the reset button, although it's not depicted, and that gets back to the same argument, that it's just the relevant figures, the relevant discussion in the patent, and the relevant claim limitation describes the configuration of the device and how it responds to that actuator signal, which undisputedly arises from the wiring state detection signal, how it responds to that actuator signal if received in the reset state. And again, they've tried to confuse the issue by saying it needs to trip in response to that signal. Well, it does if it receives, but what the claim explicitly requires is that it be configured to trip in response to it. And that's why I say that it is a bit confusing, but I think if you just step back and read the limitations in order, the limitation explicitly defines the reset state. It defines signals that can occur without reference to which state they might or might not occur. And then it specifically defines a configuration of that circuit interrupter, which needs to be able to respond in response to that actuator signal. Turning briefly to the unitary member limitation. Let me ask you about the logistics of the 398. Do we have to decide both terms if we were to affirm the commission on either the mounting or the unitary? Would that be sufficient? I think what we're at issue here are the 2003 products. I'm going to try to understand the question. Specifically with the 398, if you affirm one, you need to reach the other? Right. They found non-infringement of the 2003 product because of the mounting means and the unitary. I believe, but I don't want to talk about the respondents' individual rights. I believe that the mounting means limitation refers to two products. I believe it's a Trimone product and a GPG product, whereas the unitary member limitation, and again I'm subject to being corrected, only refers to the GPG product. So if we affirmed on the mounting means at least, that would presumably cover all the products. That's my question. I believe that would, yes. The unitary member constitutes an independent grant of non-infringement with respect to GPG's product, the 398 patent. Returning to that, I would like to address the comment that they make about the prosecution history. I'd ask Your Honor to take a look at that prosecution history, and it really does strain credibility that they were referring to the hot and neutral path without any reference to them, and instead if you look at it, they specifically underline the notion that the single member, they underline single, carry two contacts, and again they underline that. That was what they saw as their point of knowledge, and that's consistent with the plain language. But why aren't the two contacts in the 2003 product a part of a single member if they're mounted in the same plastic block? That's not even the argument that they make. I'm asking my own question. I understand. The reason would be, first of all, there's a factual finding that the members are the metal pieces basically on top of that block that each carry one contact, and that factual finding is in that ALJ's opinion. It's not appealed here. Why they're not is because the member needs to be electrically conducting, and the plastic wouldn't then naturally be part of that member, and that's, I think, you know, again, I don't want to speak on it, but I think that's why they focus on the metal separate portions of the two members and that wire in between them. But I do think, Your Honor, that the plain language of that does suggest a unitary member does suggest one member and it carries two contacts. But looking at the prosecution history, I think it makes it absolutely clear that that is what they meant by it, and I think it would really eviscerate the public notice of looking at the intrinsic record to allow them to make a distinction that is not apparent from that intrinsic record. Thank you, Your Honor, for the moment. If there are no further questions. Mr. Chin, according to my notes, you're next. Your Honor, there apparently is a confusion. I'm William Long, I represent General Potek, and we had all planned for me to go next. Okay, we'll proceed as you believe is appropriate. And I think I'm supposed to have three minutes, yes? Okay. So I'm counsel for GPG, which is one of the interveners in this portion of the case. First, I'd like to talk about the Yin-Yang case very briefly. I find that issue very difficult and confusing. I don't think that case answers all the issues. So the question was, if one product is covered by two patents and they both expire on the same day, does it matter which one we rule on? As long as one patent is infringed, we can forget about the other. Well, that's right as it relates to that one product at issue. But the problem is the injunction goes beyond that, and that was what P&S's counsel alluded to. So the injunction is go to all products that infringe this patent, and then you have to go to the customs and get a clearance for a new product. So if there are two patents on a product, it's harder to get a clearance for it than if there's only one. And so you can take this logic and go back. I don't think Yin-Yang really addresses this issue. It assumes that the scope of the injunction matches that one product, but it doesn't. It goes broader. Okay. We understand the point. The other issue I want to address has to relate to, first, the 386 and the 398 patents. So even if you reverse the commission in the 398 patent, I'm sorry, the 386 patent, if you reverse, you still must consider whether general protects infringes because we have an additional non-infringement defense. Namely, general protects product does not have a wiring state detection circuit. So there's an additional limitation that GPG's product does not have. You don't have to address that. Now, I'm going to explain that in my appeal part because the 340 patent, the limitation is detection circuit. So detection circuit and wiring state detection circuit are two different patents. The reason why GPG does not infringe is the same for both of those. I'm going to address that. Well, wait. Did you argue that on this appeal? It doesn't, well, my recollection is that you didn't, but I'll stand corrected if I'm wrong about that. No, I didn't. No, we have, we argued that we do not infringe the wiring state detection circuit. Of the 340 patent. On the 340 patent, we argue we don't have a detection circuit in our separate appeal. All right. So on this appeal, is there anything else you need to tell us? Yes. The 386 patent is invalid. It's anticipated by DeSalvo. And so, now, there have been waiver arguments raised by both Patsy Seymour and the commission, but they're just, they're just. I'll tell you what the problem is on DeSalvo. And the two guys just really didn't put in any sufficient expert testimony about this. You're asking us to look at DeSalvo, to look at these patents, and to make our own determination as to whether there's obviousness. And this has come up earlier in this argument. This is complex technology. And, you know, this is not a situation in which the court can really make an obviousness determination by looking at the prior art and the patent. That's the problem. I see my time is up. May I respond? Please reply. Sorry. GPG, there's, I'm not sure what part you're getting at, but the GPG did not form an expert decision. The other respondents did, and GPG relied on. Well, I understand that. But I'm talking about the other expert testimony, which is pretty summary and not very illuminating. Well, the thing about DeSalvo is there's really only one disputed limitation. And when you read the patent, it's black and white. You really don't need expert testimony. Yeah, that's the problem, see? There's the problem. We believe that you can read the prior art and answer the question without expert testimony on the issue. We don't believe there's any real dispute about what it says and what it does. So that's why we believe it's appropriate to review that defense. Okay. Thank you, Mr. Long. Now on your schedule is Mr. Chen. You're next. Thank you, Your Honor. I'm Jason Kor. I'm here for Intervenor Shanghai ELE. And I would like to respond to counsel's appellant's argument that Claim 1 is broad enough to cover in scope Claim 2 and others 5. Therefore, the limitation in Claim 1 should be disregarded. The Claim 1 scope as independent claimant may cover broadly the scope of dependent claimant. But that doesn't render the particular limitation in Claim 1 not effective. Still, we need to go through the limitations of Claim 1 and see whether each of the limitations is satisfied in defendant's product. And we submit that when we go through the limitations of Claim 1 itself, the limitation still possible requires a tripping in the recessed state in response to both or either the ground fault condition or the miswired condition. That's still the limitation of Claim 1, the last two claim limitations in Claim 1 that still need to be satisfied. Disregard irrespective of whether the other dependent claims covers other situation. Now, we can all get bogged down on the details, but here the big picture of their invention in this 396 pattern is they want to use the original detective circuit for the ground fault, but adding a miswiring detection and feed that into the ground fault detection circuit and trip the interrupter so that nothing else is changed except a wiring state detection is added to this. So both of these conditions need to be satisfied. Both of the ground fault and miswired needs to be responsive when the tripping happens in the recessed state. Thank you, Your Honor. Okay. Thank you, Mr. Chen. Mr. Weinstein. Good morning. As an initial matter, I'd like to point out that we basically agree with GGG that the different patterns have to be considered individually because of the scopes of the exclusion orders. So I just wanted to point that out. I'd like to address Claim 1 of the 386 pattern. So this is an apparatus claim, not a method claim, and we think really the central flaw of P&S's argument is that it's essentially reading that claim as a method claim with two parallel sequences of methods spelled, one in which the fault detection signal in the recessed state causes tripping. Why do we have three separate arguments when you don't seem to disagree with each other? Why do we have three separate arguments about this when you seem to agree with each other? The interveners don't disagree, do they? No, I don't think the interveners disagree, but I think we have different perspectives on how best to agree. You would be better off if you had agreed on a single argument. To have the commission and three interveners is not necessarily going to clarify things, but go ahead. We'll hear your argument. So as you know, an apparatus claim covers structure, not sequence steps. This is consistent with this Court's holdings and IPX holdings and Hewlett Packard v. Bausch & Wong. And since this is an apparatus claim, what it covers is a structure, and the question is really, what is that structure? To be clear, an apparatus claim could cover two alternative types of structure, but that's not what's happening here. What you have here is a structure that covers two possibilities, and although that doesn't require that both sets of method steps are actually performed in operation, it does require that the structure of the apparatus be able to handle any of those contingencies. It's also important to look at the exact language of the actuator assembly element. The language is an actuator assembly configured to provide an actuator signal in response to the fault detection signal or the wiring state detection signal. This could have been worded in the form of a component to perform A or a component to perform B. What you have there is two alternative structures, but instead it's worded as a component configured to respond to A or B. So it's clear there that the structure of the component is such that it has to be configured to handle either situation A or situation B. Even if passing scene orders construction is considered plausible, this court's holding of athletic alternatives makes it clear that between two equally plausible constructions, one narrow or one broad, the narrower construction has to prevail. Depending on the support of the specification, right? It's not automatic. So it's not automatic that the narrower construction prevails. Well, I guess what's in the specification goes to how plausible the construction is. Yes. So that's what we think. If they're equally plausible or if passing scene orders construction is less plausible, then the narrower construction has to prevail. If you find passing scene orders construction more plausible, then that wouldn't apply. So I'd just like to conclude by saying that passing scene orders acknowledge that Toronto's GFCI is not configured strictly in response to a wiring state detection signal, and for that reason it doesn't infringe. So we ask this court to affirm the commission's determination of non-infringement. Thank you. Thank you. Thank you, Mr. Nieschak. Mr. O'Veage. Yeah, with a certain abrupt limitation. So I just want to trace this through. It's still where we agree and where we disagree. If the device is in the reset state and you get a fault detection signal, we agree that you're going to get an actuator signal, and that will be provided with a circuit interrupter which trips the device. If the device is in the reset state and you get a wiring state detection signal, you will get an actuator signal that's provided with a circuit interrupter that will trip the device. The question is, what happens when the device is in the tripped state and you get the wiring state detection signal? You will get an actuator signal. But now because the device is in the tripped state... What does that have to do with this claim? What happens in the tripped state? The claim doesn't specify what the circuit interrupter must do in the tripped state. That's the issue. The claim says the circuit interrupter has to... Well, so it doesn't... Why do we care what happens in the tripped state? Because the claim is open-ended. It uses the term comprising, which means the claim is not limited. It's not limited to interrupting the circuit when the circuit is in the tripped state. It only interrupts the circuit when the circuit is in the reset state. The construction that the Commission advocated, Your Honor, would actually render claims 2 and 5 unworkable. Claims 2 and 5 would read on no embodiment because claims 2 and 5 only work when you're in the tripped state. You push the reset button to close that switch. That's starting from the tripped state. So they've read the claim 1 in a way that would mean that claims 2 and 5 read on no embodiment. They've disabled claims 2 and 5. On the unitary member, I would say a few things. One is that the word single was not underlined in the office action, as the Commission said. More importantly, going to the point about the members being permanently connected, we did argue in our brief as an alternative argument that even under the Commission's construction of single, that they have a single member because the three components are permanently attached. That's on page 58 of our opening brief. And there's a specific finding by the ALJ in that regard. He said that the two contacts, the metal members and the braided cables, are all permanently attached. That's a specific finding of the ALJ that's not contested. The issue is not really what they did with putting the word single in the claim. It's how they interpreted the word single. By the word single, what they mean is a member that's preformed of one piece of material in the manufacturing process. That's what they're saying. That's what they're saying single means. Even the plain language of single would encompass what we say, what the ALJ said, that they're all permanently attached. Lastly, I would point out that validity of the 386 patent is not raised in this appeal. It has not been raised in this appeal, the first appeal this morning. It's raised in the other appeal. That was actually improper, and it's waived because it was waived there. It's not raised in this appeal. Second, I would point out on the detection circuit limitation, Mr. Long presents it as if he can argue both the same way. The fact of the matter is in this appeal, he did not contest construction of the detection circuit limitation. He presents it as an issue of fact. You can see that on page 27 of the brief. It's not a construction issue. It's a question of fact. And their evidence was specifically rejected by the ALJ. They presented evidence of an abnormal operation of their device. When the device is used as ordinarily intended in its normal and intended process, following the instructions you get with the device, it infringes the 386 patent, claim one. Are there no further questions, Your Honor? We'll see what happens in the next argument. Thank you. Thank you, Mr. Bate. Gentlemen, this case is taken under submission.